IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Paris Avery, | ) | CIVIL ACTION NO. 9:14-0037-DCN-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Angela McCall-Tanner, Christine Wilson, | ) | |
| Demetra Garvin and Estate of Coroner Curt | ) | |
| Copeland, in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

This action, which arises out of Plaintiff's conviction and imprisonment for homicide by child abuse in May 2008, has been filed by the Plaintiff pursuant to 42 U.S.C. § 1983, alleging a violation of her constitutional rights by the named Defendants. Plaintiff alleges that the Defendants "maliciously" prosecuted her and engaged in an unlawful "conspiracy" in doing so.

Plaintiff filed a Rule 56 motion for summary judgment as to her claim for malicious prosecution against Wilson and Garvin on May 13, 2015. The Defendants McCall-Tanner and Wilson thereafter filed a memorandum in opposition as well as their own motion for summary judgment on June 12, 2015. The Defendant Garvin also filed a response in opposition to Plaintiff's motion as well as her own motion for summary judgment on June 16, 2015. Plaintiff thereafter filed a response in opposition to the Defendants' motions on June 26, 2015.



1

These motions are now before the Court for disposition.[1]

### Background and Evidence

The facts of the case reveal that in August 2006 Plaintiff was a single mother of three (3) young children who worked at the Golden Corral Restaurant to support herself and her family. On the morning of August 18, 2006, Plaintiff took her three children to a daycare facility, Carol's Childcare, and then went to work. Plaintiff got off work at 5:00 p.m., following which she and a co-worker, Angenetta Wright, picked up the children from daycare around 6:00 p.m. Following dinner, Wright took Plaintiff and the children home. Around 10:00 p.m. that evening, Wright returned to Plaintiff's house to watch the children so Plaintiff could return to another shift at work. Wright helped Plaintiff get her children ready to leave and then drove them back to Wright's house, where Plaintiff put her child (the victim) in Wright's bed. Plaintiff then went to work.

Plaintiff returned about an hour later, at which time she could not wake the child up. Wright called 911, and the paramedics who responded found that the child could not be revived and concluded that he had not been breathing and had not had a pulse for twenty to thirty minutes. After the child's body had been removed, the Defendant Wilson, an investigator with the Beaufort County Sheriff's Department, arrived and questioned the Plaintiff. Plaintiff informed Wilson that her son suffered from eczema and was taking Hydroxyzine (the generic name for Atarax) to relieve the itching. This medication was then retrieved from Plaintiff's house. The label directed dispensation of "1-half teaspoon by mouth every six hours as needed", and Plaintiff told Wilson that she had

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), D.S.C. The parties have all filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

given her child three (3) doses of Hydroxyzine that day, at around 9:00 a.m., 3:00 p.m., and sometime after 8:00 p.m. However, although the prescription had been filled only two days earlier, the bottle was over half empty. See generally, State v. Avery, Memorandum Opinion, No. 2013-MO-016 (Kittredge, dissenting).

An autopsy was performed on the victim by Dr. Michael Caplan (the pathologist), who found that the victim's organs were congested, there was fluid in the lungs, and the brain was swollen, all consistent with asphyxiation or depression of the respiratory system. Dr. Caplan also tested the victim's blood and found Hydroxyzine at a concentration of 300 nanograms per milliliter, significantly above the expected therapeutic concentration of less than 50 nanograms per milliliter. The lab work for the decedent (which was performed by National Medical Services, Inc. after having been collected by Dr. Caplan) was then forwarded to Dr. Garvin for interpretation. Garvin Deposition, pp. 53-54 (Court Docket No. 57-6, pp. 9-10)[1].

As part of her investigation of this incident, Wilson learned from Plaintiff's employer that, even though Plaintiff had told Wilson that she had given the victim a dose of Hydroxyzine at 3:00 p.m. that day, that Plaintiff had worked from 11:00 a.m. until 5:42 p.m. and could not therefore have performed this act. See Wilson's Report, p. 5 (Court Docket No. 57-4, p. 6). Wilson also spoke with a technician at the pharmacy where Plaintiff filled the Hydroxyzine prescription, who reported that following the victim's death, Plaintiff had come to the pharmacy inquiring about the dangers of interacting Benadryl and Hydroxyzine. Id., p. 7 (Court Docket No. 57-4, p. 8). Wilson

_____

[1]Many of the exhibits submitted in this case are the same, although attached to different filings by the parties with some of these exhibits containing varying select pages. In order to identify the documents relied on herein, the undersigned has listed at least one docket reference to each document, which contains the pertinent page(s) number(s) when an exhibit is cited.



3

also testified at her deposition that, as part of her investigation, she had spoken to multiple individuals who had witnessed Plaintiff give her children chemical substances, to include Benadryl, to cause drowsiness in order to restrain them. Wilson Deposition, p. 27 (Court Docket No. 57-2, p. 6); see also Wilson's Report, p. 4 (Court Docket No. 57-4, p. 5). These witnesses proffered testimony as to these events at Plaintiff's subsequent criminal trial. See Trial Transcript, pp. 79-93 (Court Docket No. 55-6, pp. 1-15).

The Defendant Garvin is a forensic toxicologist who was brought in to help interpret the medical aspects of the case. Garvin works with Forensic Sciences Network, LLC, a private company, and provides forensic toxicology services to the Beaufort County Coroner as a contracted service provider. See Garvin Affidavit, ¶ 14 (Court Docket No. 59, p. 2). After Garvin received the lab results from Dr. Caplan, she received a case history from the pathology staff at MUSC by email (see Exhibit F, Court Docket No. 57-7, p. 2), spoke with the coroner, and spoke to Investigator Wilson. Garvin Deposition, pp. 41-42 (Court Docket No. 55-3, pp. 1-2). Garvin was also aware that Plaintiff could not have provided the dosages she had told Wilson because she had not been in proximity to the medication and the child at the time, that there was a substantial amount of medication that was missing based on the way the directions were supposed to be followed,[2] and that Plaintiff had a history of using medications to get her children to go to sleep. Garvin Deposition, p. 45 (Court Docket No. 55-3, p. 4). On September 19, 2006, Garvin provided Wilson and other investigators her forensic analysis in which she concluded that the dosage directions on the

---

[2]Garvin learned that 120 milliliters of the medicine was originally dispensed, and calculated that 95 milliliters should have been in the bottle on the night of the victim's death, but that the drug laboratory report indicated that only 52 milliliters remained in the bottle when it was recovered from Plaintiff's home. Garvin Trial Testimony, pp. 198-199 (Court Docket No. 57-8, pp. 18-19).



4

Hydroxyzine bottle were correct, that assuming no one else in the family was getting this medication the child received approximately twenty-six doses over the three day period leading up to his death when the most he should have received was probably twelve doses, that the child was already toxic when he was "handed off" to the care giver, that the post mortem showed the child's dosage level was markedly elevated, that this was the cause of death although the investigators needed to hear that from the pathologist as well, and that based on her experience this was a "chemical restraint" death versus intentional poisoning. See Exhibit I (Court Docket No. 57-10).

On November 20, 2006 Dr. Caplan issued his final autopsy report finding that the child's death was caused by acute Hydroxyzine intoxication and that the manner of death was best deemed a homicide. See Exhibit J (Court Docket No. 57-11). This finding was based in part on Dr. Garvin's toxicology report. Id., pp. 10-11. Thereafter, after evaluating the evidence, including additional information received from the Department of Social Services (DSS) indicating that witnesses had reported that Plaintiff over medicated her children to "quiet them" as well as that Plaintiff had some history of abusing her children (see Defendants' Exhibits I (Court Docket No. 56-10), H (Court Docket No. 56-9), and J (Court Docket No. 56-11)), and after consulting with the Solicitor (Duffie Stone), Wilson obtained an arrest warrant for the Plaintiff on the charge of homicide by child abuse. Wilson Deposition, pp. 20-21 (Court Docket No. 56-2, pp. 3-4). Wilson's affidavit for the arrest warrant reads, in part:

> The defendant did commit an act causing the death of her child under circumstances manifesting an extreme indifference to human life. The defendant did knowingly administer to her son . . . an excessive amount of his prescribed eczema medication, hydroxyzine hcl. The markedly elevated dose or doses resulted in his death, the cause of which was reported by the pathologist as acute hydroxyzine intoxication.



5

See Defendants Exhibit O (Arrest Warrant) (Court Docket No. 57-16).

Thereafter, the Solicitor obtained an indictment (No. 2007-GS-07-927) from the Beaufort County Grand Jury charging Plaintiff with homicide by child abuse in violation of S.C.Code Ann. § 16-3-85(A)(1). See Defendants Exhibit R (Court Docket No. 57-19).

Defendant Angela McCall-Tanner was the Assistant Solicitor assigned to prosecute the case, and Plaintiff was tried on the charge on May 19, 2008. Dr. Caplan testified at trial that the cause of the victim's death was acute Hydroxyzine intoxication and that his death was a homicide. Caplan Trial Testimony, pp. 173-174 (Court Docket No. 57-5, pp. 24-25). Caplan also testified that the toxic level of Hydroxyzine in the decedent's body would have had a peak concentration in a child between two to four hours after it was administered. Id., pp. 20-23. Dr. Caplan testified that his findings were consistent with an asphyxial death, that the toxicology reports indicated an Hydroxyzine concentration far in excess of what would have been a normal dose, that the drug's most common side effect is sedation, and that in his opinion the decedent stopped breathing because an overdose of Hydroxyzine resulted in a magnification of the sedative effects of this drug resulting in acute Hydroxyzine intoxication. See Defendants' Exhibit D (Caplan Deposition), pp. 160, 163, 167, 170-173 (Court Docket No. 57-5, pp. 11, 14, 18, 21-24).

Dr. Garvin was called as an expert witness in forensic toxicology without objection from the Plaintiff, and testified that the post mortem level of Hydroxyzine found in the decedent's blood was a lethal concentration, that the medication's peek concentration would have existed between two to three hours after he was given the dose, and that based on her training and experience there were two types of intentional overdosing that occur in children - intentional poisoning to cause death, and "chemical restraint". Defendant's Exhibit G (Garvin Trial Testimony), pp. 187, 190, 193,



6

202 (Court Docket No. 57-8, pp. 7, 10, 13, 23). Dr. Garvin defined "chemical restraint" as a situation where a care giver "capitalize[s] on a medication's ability to cause drowsiness or sedation or somnolence in the child . . . . Id., p. 23.

McCall-Tanner also had witnesses available to call at trial to testify that Plaintiff had used medication in the past for the purpose of sedating her children. See Defendant's Exhibit K (Court Docket No. 57-12). However, although these witnesses' testimony was proffered, the Solicitor withdrew her intent to call these witnesses after Plaintiff's counsel stated that no defense of mistake would be presented. See Defendant's Exhibit M, pp. 120-121 (Court Docket No. 57-14, pp. 5-6).

Plaintiff moved for a directed verdict of the close of the State's case, which was denied. See Exhibit (Trial Transcript of May 21, 2008), pp. 8-9 (Court Docket No. 56-7, pp. 24-25). The jury thereafter convicted Plaintiff of homicide by child abuse and she was sentenced to thirty-five years imprisonment. Plaintiff appealed her conviction to the South Carolina Court of Appeals, which affirmed Plaintiff's conviction. Plaintiff then further appealed her conviction to the South Carolina Supreme Court, which overturned her conviction in a decision issued June 12, 2013. In its decision, the Supreme Court held that to be convicted of homicide by child abuse, the death must occur under circumstances manifesting "an extreme indifference to human life", and that even assuming Plaintiff was over medicating the deceased in an effort to get him to go to sleep, this would not alone establish "extreme indifference", which requires evidence that the defendant "consciously engaged in a life-threatening act with indifference as to whether [the deceased] lived or died". The Supreme Court held that the State had offered no evidence that the Plaintiff had ever been personally informed about the risk of over medication, and that the State had therefore failed to prove the



7

necessary <u>mens</u> <u>rea</u> from which the jury could conclude that Plaintiff had "acted without care as to whether [the deceased] lived or died so as to manifest extreme indifference to human life". <u>See</u> <u>State</u> <u>v. Avery</u>, Memorandum Opinion No. 2013-MO-016 (Kittredge dissenting).

Plaintiff then filed this lawsuit. In her First Cause of Action for malicious prosecution, Plaintiff alleges that the Defendants violated her constitutional rights by "lying and omitting material information" to the judge in obtaining a warrant, arresting Plaintiff without probable cause, and prosecuting and convicting her pursuant to the arrest warrant based on the investigation conducted by the Defendants. In her Second Cause of Action, Plaintiff alleges that the Defendants engaged in an unlawful conspiracy in violation of her constitutional rights by acting in agreement to pursue a homicide by child abuse charge against her when it was not supported by the evidence available and for the purposes of having an innocent woman convicted of a horrendous crime, and that in doing so coordinated their activities during the pre-arrest investigation and by agreeing to apply for an arrest warrant and prosecuting the Plaintiff. Plaintiff seeks monetary damages against the Defendants. <u>See</u> <u>generally</u>, <u>Amended Complaint</u>.

### Discussion

Defendants have moved for summary judgment on both of Plaintiff's claims. Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. <u>Temkin v. Frederick County Comm'rs</u>, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion



with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).

## I.

Plaintiff has sued these three Defendants under 42 U.S.C. § 1983 for violations of her constitutional rights. Section 1983 is the procedural mechanism through which Congress provided a private civil cause of action based on allegations of federal constitutional violations. See Jennings v. Davis, 476 F.2d 1271 (8th Cir. 1973). The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails. See McKnight v. Rees, 88 F.3d 417, 419 (6th Cir. 1996). To establish a cause of action under 42 U.S.C. § 1983, plaintiff must show that: (1) individual defendant(s) deprived her of a federal right, and (2) did so under color of state law. Gomez v. Toledo, 446 U.S. 635, 640 (1980); see Hall v. Quillen, 631 F.2d 1154, 1155-56 (4th Cir. 1980).

With respect to the first criteria, Plaintiff has alleged that the Defendants deprived her of a federal right by maliciously prosecuting her on meritless charges and by engaging in an unlawful civil conspiracy in doing so. These allegations set forth federal claims prosecutable under § 1983. See also, discussion, Section II infra. With respect to the second criteria, the Defendants McCall-Tanner (a solicitor) and Wilson (a police investigator) are clearly public officials/employees, and therefore meet the criteria of having committed the acts alleged under "color of state law". However, for her part the Defendant Garvin asserts that she is not a public employee and is therefore not a "state actor" for purposes of a § 1983 claim, as in the context of a § 1983 action, purely private conduct, no matter how wrongful, injurious, fraudulent, or discriminatory, is not actionable. See Correctional Services Corporation v. Malesko, 534 U.S. 61, 75 (2001); Lugar v. Edmondson Oil Co.,



9

457 U.S. 922, 936 (1983).

However, although not a public employee <u>per se</u>, it is clear in the evidence that Garvin's job was to provide toxicology services to the County pursuant to a contract for such services and opinions. Such a contract for services may be sufficient to subject an otherwise private actor to liability under § 1983, and considered in the light most favorable to the Plaintiff, the evidence presently before the Court is sufficient to deny Garvin's request for summary judgment on this ground. <u>See</u> <u>Wickersham v. City of Columbia</u>, 481 F.3d 591, 599 (8th Cir. 2007) ["When a private entity has acted jointly and intentionally with the police pursuant to a 'customary' plan, it is proper to hold that entity accountable for the actions which it had helped bring about."], <u>cert</u>. <u>denied</u>, 128 S.Ct. 387 (2007); <u>cf</u>. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988) [Holding that private physicians that contracted with the State to provide medical care to prisoners were state actors]; <u>Jones v. Correctional Care Solutions</u>, No. 09-269, 2010 WL 2639788, at * 6 (D.S.C. June 7, 2010) [Declining to recommend dismissing Correctional Care Solutions on the basis that it did not act under color of state law], <u>adopted by</u> 2010 WL 2926178 (D.S.C. July 23, 2010), <u>aff'd</u>, 397 Fed.Appx. 854 (4th Cir. Oct. 6, 2010); <u>Rhea v. Gerold</u>, No. 09-818, 2009 WL 1346139, at * 3 (D.S.C. May 12, 2009) [Addressing claims against privately owned Care Center that provided contract services to the State by using a § 1983 analysis]; <u>Jenkins v. Thomas</u>, No. 14-1679, 2015 WL 1546265 at n. 7 (D.S.C. Apr. 6, 2015); <u>see also</u> <u>Muhammed v. Klotz</u>, 36 F.Supp. 2d 240, 243 (E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."], citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 247, 250-252 (1986).



Therefore, absent some other ground for entitlement to dismissal as party Defendants, all three Defendants are subject to suit under § 1983 for damages in their individual capacities.

## II.

Plaintiff's claims against these Defendants are for malicious prosecution and conspiracy. As noted, supra, these are both claims that can be pursued in a § 1983 action. The elements of these claims are as follows:

**Malicious Prosecution**. Malicious prosecution is a cause of action resulting from the wrongful institution of legal process. Wallace v. Kato, 549 U.S. 384, 389 (2007).[3] In order to avoid summary judgment on her malicious prosecution claim, Plaintiff must show both that the initiation or maintenance of the proceeding against her was without probable cause, and that the proceedings were terminated in her favor. See Lambert v. Williams, 223 F.3d 257, 260-261 (4th Cir. 2000) [Claim for malicious prosecution requires a showing that the initiation or maintenance of the proceeding against the Plaintiff was without probable cause to support it, and that the proceedings were terminated in favor of the Plaintiff]. Although Defendants argue that Plaintiff's conviction at

---

[3]This is a separate and distinct claim from a claim for false arrest or imprisonment. Wallace v. Kato, 549 U.S. at 389 ["Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process - when, for example, he is bound over by a Magistrate or arraigned on charges . . . Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process."] (internal citations omitted); see also Panzica v. Corrections Corp. of America, 559 Fed.Appx. 461, 464-465 (6th Cir. Mar. 17, 2014)[Distinguishing between claims for malicious prosecution and false imprisonment]; Singer v Fulton County Sheriff, 63 F.3d 110, 117 (2d Cir. 1995) (quoting Prosser and Keeton on Law of Torts § 119, pp. 885-886 (5th ed. 1984)["If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself"]). Plaintiff has not asserted a claim for false arrest or imprisonment in this case.



11

trial and the upholding of her conviction by the State Court of Appeals should prevent her from claiming vindication in her criminal case, it is undisputed that the State Supreme Court overturned her conviction and that the proceedings were ultimately terminated in Plaintiff's favor. See Heck v. Humphrey, 512 U.S. 477, 487 (1994)[defining "favorable termination" as proof "that the conviction or sentence has been reversed on direct appeal, . . . . "]. Therefore, Plaintiff has satisfied the favorable termination requirement in this case.

Even so, to avoid summary judgment on this claim, Plaintiff must still have evidence sufficient to create a genuine issue of fact as to whether the initiation or maintenance of the charges against her were without probable cause. To prove an absence of probable cause, Plaintiff's evidence must be sufficient to show that it was unjustifiable for a Defendant to have concluded that she was violating or had violated the law. Brown v. Gilmore, 278 F.3d 362, 368 (4th Cir. 2002).

**Civil Conspiracy**. With respect to Plaintiff's Second Cause of Action for conspiracy, to survive summary judgment on this claim Plaintiff's evidence must be sufficient to create a genuine issue of fact as to whether the Defendants acted jointly in concert with some conspiratorial objective which resulted in a violation of her constitutional rights. See Marshall v. Odom, 156 F.Supp. 2d 525, 532 (D. MD. 2001)["To establish a civil conspiracy under § 1983, [the plaintiff] must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right."], citing Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir.1996). Plaintiff carries a "weighty burden" in establishing a civil rights conspiracy. Isolated acts by Defendants that fail to evidence a "shared understanding will not suffice to survive a motion for summary judgment". Marshall, 156 F.Supp.2d at 532; Hinkle, 81 F.3d at 421-423.

12



Having established the elements of Plaintiff's causes of actions and what she is required to prove to prevail on these claims, the Court next turns to an examination of whether Plaintiff has submitted evidence sufficient to establish a genuine issue of fact as to liability with respect to either of these two causes of action against any named Defendant.

### III.

With respect to the Defendant McCall-Tanner, although as a public official she is subject to suit under § 1983, McCall-Tanners argues, <u>inter alia</u>, that she is nonetheless entitled to dismissal as a party Defendant in this lawsuit because, as the prosecutor in Plaintiff's criminal case, she enjoys absolute immunity from suit. After careful review of the arguments and evidence presented, the undersigned is constrained to agree.

Prosecutors have absolute immunity from civil liability for activities performed as "an officer of the court" where the conduct at issue was closely associated with the judicial phase of the criminal process. <u>See</u> <u>Van de Kamp v. Goldstein</u>, 555 U.S. 335, 341-343 (2009). For example, when a prosecutor "prepares to initiate a judicial proceeding," "appears in court to present evidence in support of a search warrant application," or conducts a criminal trial, bond hearings, grand jury proceedings, or pre-trial "motions" hearings, absolute immunity applies. <u>Id.</u> at 343; <u>see also</u> <u>Buckley v. Fitzsimmons</u>, 509 U.S. 259 (1993); <u>Dababnah v. Keller–Burnside</u>, 208 F.3d 467 (4th Cir. 2000). Plaintiff does correctly note that prosecutors have only qualified immunity for actions taken outside of judicial proceedings; <u>see</u> <u>Buckley v. Fitzsimmons</u>, <u>supra</u>; <u>Burns v. Reed</u>, 500 U.S. 478 (1991); and in an attempt to get around McCall-Tanner's otherwise absolute immunity from suit, Plaintiff alleges in her Amended Complaint that McCall-Tanner's liability in this case is actually based on her being a part of the underlying investigation that led to the filing of criminal charges

13



against her. Indeed, it was this allegation, sufficiently pled in Plaintiff's Amended Complaint, which led this Court to deny McCall-Tanner's previously filed Rule 12 motion to dismiss. See Court Docket Nos. 40, 42.

However, in arguing for denial of McCall-Tanner's Rule 56 motion for summary judgment, Plaintiff cannot merely rely on her pleadings but must present actual *evidence* in support of her claim. Plaintiff has presented no evidence whatsoever to show that McCall-Tanner played any role in the investigation of her criminal case. In fact, Plaintiff herself concedes in her memorandum seeking summary judgment against the other two Defendants that McCall-Tanner "had no involvement in the case prior to the arrest warrant being issued". See Plaintiff's Brief, p. 3 (Court Docket No. 47). Plaintiff also admitted during her deposition that she had no evidence that McCall-Tanner was involved in the investigation of her case. See Plaintiff's Deposition, pp. 112-113 (Court Docket No. 56-8). Rather, Plaintiff's theory of liability with respect to McCall-Tanner as set forth in her brief is that McCall-Tanner failed to tell Garvin, prior to Garvin's testimony at trial, that the child's father had written Wilson a letter in which he stated that Plaintiff had told him that she may have accidently given the child an incorrect dosage of medicine, and that Angenetta Wright had told Wilson during the investigation that Plaintiff had told her [Wright] that she had given the victim the proper dosage of medicine. See Plaintiff's Exhibits 3 and 4 (Court Docket Nos. 47-4 & 47-5).

Plaintiff's theory of liability on the part of McCall-Tanner is without merit. Even assuming Plaintiff's argument as to what McCall-Tanner may or may not have told Garvin prior to Garvin's trial testimony to be true for purposes of summary judgment, that does not subject McCall-Tanner to liability in this lawsuit, as any such conduct would clearly have been part and parcel of McCall-Tanner's preparation for the trial of Plaintiff's case. See Hill v. City of New York, 45 F.3d



14

653, 661 (2nd Cir. 1995) [A prosecutor "is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial. Such official is also immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged. Prosecutorial immunity from § 1983 liability is broadly defined, covering virtually all acts, regardless of motivation, associated with [the prosecutor's] function as an advocate"], (internal citations omitted); see also Barbera v. Smith, 836 F.2d 96, 100 (2nd Cir. 1987) [Absolute immunity attaches to a prosecutor's organizing and evaluating evidence for trial]. "Nor do the plaintiff's allegations of a conspiracy alter this rule . . . [A]bsolute prosecutorial immunity extends even to conspiracies to present false evidence at trial . . . [and] the fact that such a conspiracy is not something that is *properly* within in the role of a prosecutor is immaterial because immunity attaches to the function the prosecutor is performing, not the way in which it is performed." Hill, 45 F.3d at 662 (internal citations omitted); see also Dory v. Ryan, 25 F.3d 81, 83 (2nd Cir. 1994).

Hence, as the evidence shows that McCall-Tanner only became involved in Plaintiff's case after she was assigned the case following the issuance of the warrant, and as Plaintiff has presented no evidence to show that McCall-Tanner was involved in the investigatory part of her case, McCall-Tanner enjoys absolute prosecutorial immunity from suit in this case and is therefore entitled to dismissal as a party Defendant. Hill, 45 F.3d at 661 [Prosecutor absolutely immune from civil liability for initiating a prosecution, evaluating and organizing the evidence for presentation at trial, and presenting the case at trial]; see Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)[absolute immunity "is an immunity from suit rather than a mere defense to liability"].

15

# IV.

Plaintiff's claims against Wilson and Garvin are that she was charged with a crime and prosecuted without probable cause (malicious prosecution) as a result of the Defendants "lying and omitting material information to a Magistrate by a government actor acting in an investigating capacity". This conduct was further allegedly the result of "an express or implied agreement to pursue a homicide by child abuse charge against [Plaintiff] when it was not supported by the evidence available and for the purposes of having an innocent woman convicted of a horrendous crime". Plaintiff further alleges that this conspiracy consisted of overt and coordinated acts "during the pre-arrest investigation, by [the Defendants] agreeing to apply for an arrest warrant and prosecuting the Plaintiff". See Amended Complaint, ¶ ¶ 49, 52.

Plaintiff's allegations relate to the period of the investigation leading up to her prosecution by the State.[4]

### Defendant Christine Wilson

Wilson was the investigator who responded to the scene the night Plaintiff's child died. Plaintiff alleges that in obtaining the arrest warrant against her, Wilson made materially

---

[4]Although Plaintiff also discusses at some length Garvin's testimony at her criminal trial, Garvin is absolutely immune from suit with respect to her trial testimony. Burke v. Miller, 580 F.2d 108, 109 (4th Cir. 1978) [Witness in a state judicial proceeding enjoys absolute immunity from suit]; Briscoe v. LaHue, 460 U.S. 325 (1983) [Witnesses enjoy absolute immunity with respect to trial testimony without regard to their status as private citizens or government officials]. Garvin's testimony at trial does not, however, "relate backwards" to protect her from any improper pretrial acts she may have committed in the investigatory stage of Plaintiff's case, notwithstanding any connection those acts might have to her later testimony. Gregory v. City of Louisville, 444 F.3d 725, 738-739 (6th Cir. 2006); see also Mastroianni v. Bowers, 160 F.3d 671, 677 (11th Cir. 1998), vacated on other grounds, 173 F.3d 1363 (11th Cir. 1999). Therefore, Garvin (as well as Wilson) may be subject to liability for any wrongful acts committed during the investigatory phase of Plaintiff's case.



misleading and false statements in her affidavit to the County Magistrate. Plaintiff primarily cites two examples to support this argument.

First, Wilson met with Angenetta Wright on September 28, 2006 for a second interview concerning the events of the night of August 18, 2006, and during this interview Wright told Wilson (as reflected in Wilson's investigation notes) that the Plaintiff "never admitted to [Wright] that she gave [the deceased] too much medication. In fact, she maintained she had given him the proper amount, because [Wright] confronted her about it". See Plaintiff's Exhibit 3 (Court Docket No. 47-4). Plaintiff complains that Wilson did not provide this information to either the Defendant Garvin, as part of obtaining a toxicology report/opinion from her, nor did she provide this information to the County Magistrate in obtaining the arrest warrant.

Second, the evidence reflects that at some point Wilson received a letter from the child's father, Rotondo Young, in which Young wrote that "[f]or some reason [Plaintiff] told me [the deceased child] was taking tablespoon dosages instead of teaspoon as stated in the case history of the Forensic Autopsy Final Report". See Plaintiff's Exhibit 4 (Court Docket No. 47-5). Plaintiff complains that Wilson's file does not indicate when she received this letter, but that in any event she did not include it as part of her investigative report nor did she ever provide this information to Garvin or the County Magistrate.

Plaintiff argues that "[b]oth Wright's statement and Young's letter pointed to the possibility of accidental ingestion of the Hydroxyzine, or some other non-intentional error, but Wilson simply did not disclose it". Plaintiff argues that the warrant was therefore obtained without probable cause, thereby subjecting Wilson to liability. However, while Plaintiff is correct that Wilson could be subject to liability if the affidavit she submitted to the County Magistrate omitted



17

"material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading"; United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990) (internal quotation marks omitted); to avoid summary judgment on this claim, she must have evidence sufficient to create a genuine issue of fact as to whether Wilson "deliberately or with a reckless disregard for the truth made material false statements in [her] affidavit". Miller v. Prince of George's County, Maryland, 475 F.3d 621, 627 (4th Cir. 2007), citing Franks v. Delaware, 438 U.S. 154, 171 (1978) (internal quotation marks omitted). After careful review and consideration of this evidence, the undersigned does not find that Plaintiff has met this standard in this case.

"Reckless disregard can be established by evidence that an officer acted with a high degree of awareness of [a statement's] probable falsity, that is, when viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported". Miller, 475 F.3d at 627 (internal quotations omitted); see also Wilson v. Russo, 212 F.3d 781, 788 (3rd Cir. 2000). Looking at the evidence in this case, Plaintiff has not shown there is any "false" or inaccurate information presented in Wilson's statement in her affidavit to the County Magistrate. See Defendants' Exhibit O (arrest warrant)(Court Docket No. 57-16). In her statement, Wilson seeks a warrant from the County Magistrate based on the Plaintiff having knowingly administered an excessive amount of the prescribed medication to the decedent. Wilson states that the markedly elevated dose or doses administered resulted in the decedent's death, the cause of which was reported by the pathologist as acute Hydroxyzine intoxication. Wilson's statement to the County Magistrate further stated that the Plaintiff's conduct as described therein manifested an "extreme indifference to human life". Id. There is certainly enough evidence in the case record to support these statements and a finding of



18

probable cause. <u>Gantt v. Whitaker</u>, 57 Fed. Appx. 141, 148 (4th Cir. Jan. 23, 2003) [Evidence making it more likely than not that a crime was committed is sufficient to establish probable cause regardless of whether it is ultimately sufficient to support a conviction].

        As evidence to support her affidavit, Wilson had statements from witnesses that the Plaintiff had a history of intentionally over medicating her children with medications in order to get them to go to sleep; evidence that Plaintiff had previously been cited by government agencies with mishandling her children, including over medicating her children to "quiet them"; evidence that the decedent had been substantially overmedicated with prescription medication on the day of his death; and that Plaintiff had provided false information to the investigator about the amount and times on which she had administered medication to the decedent on that day. <u>See Exhibits, Wilson's Report</u> (Court Docket No. 57-4); <u>Wilson Deposition</u>, pp. 13, 18, 27, 37-38 (Court Docket No. 56-2); <u>Trial Transcript of May 19, 2008</u>, pp. 79-93 (Court Docket No. 55-6, pp. 1-15); <u>Defendants' Exhibit M</u> (Victim's Medical Records)(Court Docket No. 55-13); <u>Defendants' Exhibit I</u> (D.S.S. Records)(Court Docket No. 56-10); <u>Defendants' Exhibit H</u> (Virginia D.H.S. Records)(Court Docket No. 56-9); <u>Defendants' Exhibit J</u> (Virginia D.H.S. Records)(Court Docket No. 56-11). Wilson had also received the results of Dr. Garvin's toxicology report indicating the decedent had been given a lethal amount of medication as well as the pathologist's report in which Dr. Caplan listed the cause of death as best deemed a homicide. <u>See</u> Court Docket No. 57-11 (Caplan's Final Autopsy Report). Finally, Wilson testified at her deposition (and Plaintiff has presented no evidence to dispute) that Wilson had consulted with the Solicitor (Duffie Stone) with respect to the evidence in order to determine the appropriate charge to bring based on the evidence (homicide by child abuse). <u>See</u> <u>Wilson Deposition</u>, pp. 20-21 (Court Docket No. 56-2, pp. 3-4); <u>see also</u> S.C.Code Ann. § 16-3-85



[Person is guilty of homicide by child abuse if they cause the death of a child under the age of 11 while committing child abuse or neglect under circumstances manifesting an extreme indifference to human life].  Nothing in this evidence creates a genuine issue of fact as to whether Wilson, in setting forth the information in her affidavit to the County Magistrate, had cause to, or did, entertain "serious doubts as to the truth of [her] statements or had obvious reasons to doubt the accuracy of the information [she] reported".  Wilson, 212 F.3d at 788.

Although, as discussed hereinabove, the evidence does not support Plaintiff's claim that Wilson made any affirmative materially false statements in her affidavit, Wilson may still be subject to liability if she, alternatively, "*omitted* from that affidavit material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading".  Colkley, 899 F.2d at 300.  (Emphasis added).  Under this theory of liability, "reckless disregard" can be established "by evidence that a police officer failed to inform the judicial officer of facts [she] knew would negate probable cause".  Miller, 475 F.3d at 627, citing Beauchamp v. City of Noblesville, Inc., 320 F.3d 733, 743 (7th Cir. 2003).  However, this theory of liability also fails for the simple reason that the "evidence" cited to by the Plaintiff to support this claim does not negate probable cause for the issuance of the warrant, nor is there any evidence that Wilson would have had any reason to believe that it would have done so.  Brown, 278 F.3d at 368 [To prove an absence of probable cause, Plaintiff must have evidence to show that it was unjustifiable for a reasonable police office to conclude that Plaintiff had violated the law].

Simply put, the fact that after learning that her child had died Plaintiff denied to Angenetta Wright that she had done anything wrong, or that the father of the child had written a letter to Wilson wherein he mentioned that Plaintiff had told him that the decedent had been taking

tablespoons instead of teaspoons of the medication,[5] does not affect the substantial evidence (discussed, _supra_) Wilson had at the time she obtained the warrant supporting a conclusion that Plaintiff had intentionally overmedicated her son with a prescription drug, resulting in the child's death. States v. Sowards, 690 F.3d 583, 588 (4th Cir. 2012) ["Probable cause exists if, given the _totality of the circumstances_, the officer 'had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense'"] (emphasis added), citing Beck v. Ohio, 379 U.S. 89, 91 (1964); Gantt v. Whittaker, 57 Fed.Appx. 141, 148 (4th Cir. Jan. 23, 2003)[For purposes of establishing probable cause, evidence need only be sufficient to make it "more likely than not" that a crime has been committed].[6]

 Finally, as was noted by the Fourth Circuit in Miller, in order to violate the Constitution any allegedly false statement or omission by Wilson must have been "material"; that is,

---

[5]A claim that not only the decedent's father stated in this letter he did not believe, but that Plaintiff did not even herself advance. Plaintiff told Wilson during her interview that she followed the dosage instructions on the label and used the dosage spoon, and the dosage spoon was located with the prescription bottle. Wilson Report, p. 3 (Court Docket No. 57-4, p. 4); see also Garvin Deposition, p. 47 (Court Docket No. 47-11). Further, Plaintiff testified at her deposition that she did not use a tablespoon instead of teaspoon to administer medication to her son, that she had never told Young that she had confused tablespoons and teaspoons, and that Young's letter was a lie. See Plaintiff's Deposition, pp. 64, 68, 74, 78-79 (Court Docket No. 56-8); see also McCall-Tanner Deposition, p. 58 (Court Docket No. 55-2, p. 8).

[6]Wilson additionally argues that the fact that the warrant she obtained was pursuant to the advice and recommendation of the Solicitor is in and of itself sufficient to warrant dismissal of Plaintiff's claim. See Broyhill v. Resolution Mgmt. Consultants, Inc., 736 S.E.2d 867, 871 (S.C.Ct. App. 2012) ["Good faith reliance upon advice of fully informed counsel may establish probable cause"]; Melton v. Williams, 314 S.E.2d 612, 615 (S.C.Ct.App. 1984) [Noting the "advice of counsel" defense is available when the defendant shows he "sought the advice in good faith, acted thereon in good faith and believed the charge was true"]. However, since there is no evidence to show exactly what facts and evidence Wilson presented to Stone, this argument is not by itself sufficient to warrant a grant of summary judgment. Melton, 314 S.E.2d at 615 [Holding that a "fair, full, and truthful disclosure" of all the facts to the Solicitor is required to show good faith].

"necessary to the [neutral and disinterested Magistrate's] finding of probable cause". <u>Miller</u>, 475 F.3d at 628, citing <u>Franks</u>, 438 U.S. at 155-156. In evaluating whether the evidence cited by the Plaintiff is "material", the reviewing court should insert the facts or evidence omitted from the warrant, and then determine whether or not the "corrected" warrant affidavit would establish probable cause. If the "corrected" warrant affidavit still establishes probable cause, no civil liability lies against the officer. <u>Miller</u>, 475 F.3d at 628; <u>see also Wilson</u>, 212 F.3d at 789. Such is the case here.

Even if the fact that Plaintiff had denied to a third party that she had done anything wrong, or information that the father of the child had written a letter to the investigating officer stating that Plaintiff had claimed she may have used the wrong - sized spoon to administer the medication (which Plaintiff's own statements to Wilson contradicted and refuted), had been provided by Wilson to the County Magistrate at the time she obtained the warrant, in light of the other substantial evidence indicating that a crime had occurred as has previously been discussed herein, <u>supra</u>, to include Plaintiff's own contradictory claims and statements about the amounts and times of dosages administered to the decedent, any such "corrected" affidavit would still have provided more than enough evidence to support a finding of probable cause that a crime had been committed. <u>Gantt</u>, 57 Fed. Appx. at 148 [For purposes of establishing probable cause, evidence need only be sufficient to make it "more likely than not" that a crime has been committed]. The fact that Plaintiff's conviction on this charge was later overturned by the State Supreme Court is not a relevant factor in considering whether there was probable cause for the charge. <u>Jackson v. City of Pittsburgh</u>, 492 Fed.Appx. 297, 299 (3d Cir. 2012) [noting that the ultimate dismissal of charges is not relevant to whether the defendant officers had probable cause to arrest Plaintiff at the time of his arrest]; <u>Wright v. City of Philadelphia</u>, 409 F.3d 595, 602 (3rd Cir. 2005) ["[I]t is irrelevant to the probable

cause analysis . . . whether a person is later acquitted of the crime for which he or she is arrested"].

Therefore, as Plaintiff has failed to present evidence sufficient to create a genuine issue of fact as to whether Wilson did not have probable cause to pursue the charges against her, Wilson is entitled to summary judgment on Plaintiff's malicious prosecution claim. Lambert, 223 F.3d at 260-261 [Claim for malicious prosecution requires a showing that the initiation or maintenance of the proceeding against the plaintiff was without probable cause to support it]; Brown, 278 F.3d at 368 [To prove an absence of probable cause, a plaintiff must have evidence sufficient to show that it was unjustifiable for a reasonable officer to conclude that Plaintiff had violated the law]. Sowards, 690 F.3d at 588 ["Probable cause exists if, given the totality of the circumstances, the officer 'had reasonably trustworthy information . . . sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense'"].

Further, as Plaintiff has failed to present evidence sufficient to create a genuine issue of fact as to whether Wilson obtained and pursued charges against her in the absence of probable cause, her second claim against Wilson for "conspiracy" also fails, as she has failed to show that Wilson's actions resulted in a deprivation of Plaintiff's constitutional rights. See Hinkle, 81 F.3d at 421 ["To establish civil conspiracy under [Section 1983], a [Plaintiff] must present evidence that the [Defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [a] deprivation of [the Plaintiff's] constitutional right"]; Glassman v. Arlington County, VA, 628 F.3d 140, 150 (4th Cir. 2010) [Explaining that a § 1983 civil conspiracy claim is properly dismissed when there is no evidence that the defendant's actions resulted in the deprivation of a constitutional right]. Therefore, Wilson is also entitled to summary judgment on



23

Plaintiff's civil conspiracy cause of action.

### Defendant Demetra Garvin

Although Plaintiff's malicious prosecution claim is asserted against all of the Defendants, including Garvin, Plaintiff only alleges that this claim is a result of the Defendants "lying and omitting material information to a Magistrate by a government actor acting in an investigation capacity". See Amended Complaint, ¶ 49. There is no evidence whatsoever that Garvin ever made any statements or presented any information to the County Magistrate. Rather, it was Wilson, as the investigating officer, who decided what information to present and what statement to make to the judge in support of a finding of probable cause for the charge. Cf. Singer, 63 F.3d at 117 [Damages for malicious prosecution claim are based on the wrongful use of judicial process]. Further, Garvin, as the toxicologist, was not the person who decided whether to pursue criminal charges against the Plaintiff - that decision was made by Wilson after consultation with Solicitor Duffie Stone. See Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1999) ["Liability . . . must be based on the personal involvement of the Defendant"], cert. denied, 522 U.S. 1154 (1999).

Plaintiff's claim against Garvin as set forth in her brief is that Garvin reached a conclusion that Plaintiff had used Hydroxyzine to "chemically restrain" her child without speaking to the Plaintiff, any witnesses, the pharmacist, and without reviewing any medical or pharmacy records. Plaintiff also complains that Garvin opined as to the cause and manner of death of the decedent, even though under South Carolina law only physicians can testify[7] on these matters. See Plaintiff's Brief in support of Summary Judgment, pp. 2, 10-12. However, while it is certainly

---

[7]As previously noted, Garvin's testimony at Plaintiff's trial is not at issue in this case. See n. 3, supra.



possible that Garvin could be liable for acts she took in the investigatory stage of Plaintiff's case if there was any evidence to show that she knowingly fabricated evidence and a reasonable likelihood exists that the false evidence resulted in charges being filed against the Plaintiff; cf. Gregory v. City of Louisville, 444 F.3d 725, 737 (6th Cir. 2006);[8] there is no evidence that Garvin knowingly "fabricated" any evidence in this case.[9]

Garvin did not collect the specimens from the deceased, those were collected by Dr. Caplan, the pathologist. Garvin is also not the one who completed the lab reports in this case, those were done by a separate company (National Medical Services) to which they were sent by Dr. Caplan. It was only after the lab reports had been completed that the results were sent by Dr. Caplan to Garvin for a toxicology report. Garvin's toxicology report is in turn an analysis and report of the lab findings, which includes the amount of Hydroxyzine found in the decedent's system and other findings. See Defendants' Exhibit H (Court Docket No. 57-9). Garvin thereafter reported her

---

[8]Even so, it is unclear as to whether a "malicious prosecution" claim against Garvin would be proper in any event, as there is no evidence she was involved in the decision to prosecute the Plaintiff. See discussion, supra and infra. Plaintiff has not asserted a false arrest claim against Garvin (or against anyone in this case), even assuming any such claim would have been proper under the facts presented. Cf. Gregory, 444 F.3d at 740-741; Singer, 63 F.3d at 117 [Damages for false arrest claim cover the arrest and time of detention up until issuance of process or arraignment, but not thereafter].

[9]Even assuming (without deciding) that Garvin was negligent in not having done more investigating on her own into the circumstances of the decedent's death, that is a far cry from Garvin having "fabricated" evidence in this case, and would not be a basis for liability. Negligence does not rise to the level of a constitutional violation. See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200–203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; see Paul v. Davis, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right]; Smith v. Regional Director of Florida Dep't of Corrections, 368 Fed.Appx. 9, 14 (11th Cir. Feb.10, 2010) ["simple negligence is not actionable under § 1983...."].

findings to Wilson, which included findings as to what the correct dosage amount of the medication should have been; the amount of dosage the decedent was apparently given based on the information that had been *provided to her* (and with the additional caveat stated by Garvin in her report that this was based on the assumption that no one else in the family had been receiving this medication); that while Garvin believed the cause of death was a toxic overdose, the investigators (again, another caveat) would "need to hear it from the pathologist too"; and a finding based on the lab reports that the decedent's dosage was markedly elevated (a finding which Plaintiff does not even dispute). There is no indication of any misstated or "fabricated" evidence in these findings.

Rather, Plaintiff's complaint against Garvin comes from the next to the last numbered paragraph in Garvin's report, wherein Garvin states that, based on her experience, this would have more likely been the result of a case of chemical restraint than an intentional poisoning. See Defendants' Exhibit I (Court Docket No. 57-10). However, while Plaintiff argues that Garvin should have said nothing at all about how the child's overdose could have occurred, there is no evidence in these exhibits that Garvin intentionally fabricated any information in her toxicology report. Garvin's statement as to how the toxic amounts of the medication could have come to be in the deceased's body was based on the lab results and what had been reported to Garvin with respect to the amount of dosage that was missing, none of which is disputed even by the Plaintiff. Further, Garvin clearly qualified her statement and noted that the investigators would need to confirm any conclusions with the pathologist. Additionally, even if it *was* improper for Garvin to have opined that the decedent's death could have been caused by "chemical restraint", that conclusion (according to the State Supreme Court in its opinion reversing Plaintiff's conviction) is not enough, by itself, to sustain a conviction for homicide by child abuse, a charge which in any event was decided on, obtained and



26

filed by Wilson after consultation with Solicitor Stone, not by Garvin.

In sum, there is simply nothing in this evidence to show that, in issuing her toxicology report, Garvin "fabricated" any evidence or engaged in any wrongful conduct so as to subject her to liability in a § 1983 action. Pierce v. Gilchrist, 359 F.3d 1279, 1300 (10th Cir. 2004) [Action may only proceed against a forensic examiner where there is evidence the examiner falsified her investigative report]; Gregory, 444 F.3d at 740 [Intentional fabrication of a forensic report may subject examiner to liability]. There is also no evidence that Garvin was thereafter involved in Plaintiff's prosecution other than as a testifying witness, for which she has no liability. See, n. 3, supra. Therefore, Plaintiff has no evidence to support a viable malicious prosecution claim against this Defendant.

As for Plaintiff's "conspiracy" claim against Garvin, in addition to the evidence failing to show she violated Plaintiff's constitutional rights, since Garvin is the sole Defendant remaining in this case, there was no one for her to "conspire" with. Marshall, 156 F.Supp.2d at 532 [To establish a civil conspiracy under 1983, Plaintiff must present evidence that a defendant acted jointly in concert with another to violate a constitutional right].

Therefore, Garvin is entitled to summary judgment in this case.

### Conclusion

Based on the foregoing, it is **recommended** that the Plaintiff's motion for summary judgment be **denied,** that the Defendants' motions for summary judgment be **granted,** and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.



October 21, 2015
Charleston, South Carolina

_____
Bristow Marchant
United States Magistrate Judge

p 28

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).



29